LILLIAN HUNKE, RESPONDENT, v. EDWARD HUNKE AND CATHERINE HUNKE, APPELLANTS.

*Argued February 8, 1927—Decided May 16, 1927.*

1. Alleged errors to which the trial court's attention has not been directed and which the state of the case shows have not been the subject-matter of exceptions will not be considered by this court on appeal.
2. This court has no power to review in a civil case the weight of the evidence and the alleged excessiveness of the verdict.
3. Motions for nonsuit and the direction of a verdict, for the purpose of the motions, in effect, admit the truth of the evidence, and of every inference of fact that can be legitimately drawn therefrom, which is favorable to the plaintiff, but deny its sufficiency in law; such motions will be denied where the evidence or inferences of fact will support a verdict for the plaintiff.
4. In a suit for damages for the alienation of the affections of the plaintiff's husband, the evidence offered in behalf of the plaintiff examined, and *held* to be sufficient to have justified the trial judge in overruling the defendants' motions to nonsuit and for the direction of a verdict.

On appeal from the Supreme Court.

For the appellants, *William F. Burke* and *William C. Asper.*

For the respondent, *Fallon & Fallon.*

The opinion of the court was delivered by

KATZENBACH, J. This is an appeal from a judgment of the Supreme Court entered upon the verdict of a jury. The action was one instituted by a daughter-in-law against the parents of her husband to recover damages for the alienation of the affections of the plaintiff's husband. The case was tried at the Hudson Circuit. The defendants below are the appellants in this court. They will be hereafter referred to as the defendants. The plaintiff below (hereafter called the plaintiff), Lillian Hunke, was married to Harry Hunke on

August 6th, 1919. The plaintiff was then nineteen years of age. Her husband was twenty-two. From the date of their marriage until June, 1922, they resided in New York City. A child, a son, was born. The plaintiff testified that during the period of their residence in New York City they lived together happily. No difficulties arose to mar their married bliss. The husband worked during the day in a broker's office. He spent his evenings at home. Their domestic life was rippleless. In June, 1922, they left New York City and took up their residence in an apartment in Woodcliffe, in this state, three blocks from the residence of the defendants. Within a short time after this change of residence the plaintiff's husband became indifferent. He stayed away from his home at nights. When the plaintiff would ask him where he had been he would reply that he had been to his parents' residence.

On October 12th, 1922, the plaintiff and her husband were at the home of the defendants. The plaintiff heard the defendant Mrs. Catherine Hunke say to her son Harry that it would be a good idea if he and his wife placed their household goods in storage and both went to work, as in that way he would be able to save some money and pay his debts. The plaintiff remonstrated with her mother-in-law for this advice to her husband. She (the plaintiff) knew of no debts which her husband had. This was said by Catherine Hunke in the presence of her husband, Edward Hunke. He heard it and apparently acquiesced in the suggestion as he did not remonstrate with his wife for giving it.

On October 20th, 1922, the defendant Catherine Hunke called on the plaintiff at her home and again suggested the breaking up of the home, as she had done on October 12th. She made the further suggestion that her daughter-in-law could go to her parents' home and her mother could take care of the baby while the plaintiff worked, and that Harry could come to his home and in this way money would be saved. The plaintiff said she saw no reason for breaking up their home, her husband was making a good salary and they were getting along nicely.

On the following afternoon (October 21st, 1922) Catherine Hunke again came to the house with a daughter, Alice, and remained until one the following morning. She talked to her son alone. She then said to her son, in the presence of the plaintiff: "Harry, we want to take you up to Montclair with us." Turning to the plaintiff, she said: "I don't think you and the baby had better come. It is quite cold up there and we have no fire." The Montclair house was the summer home of the defendants.

On October 22d, 1922, Harry Hunke returned to his home for half an hour. He left at six P. M. He did not return. On the following morning (October 23d) the plaintiff and her sister, Florence, went to the defendants' home. The sister rang the bell. Catherine Hunke appeared at the window. The sister said: "Harry didn't come home all night." Admission to the house was asked. It was refused. Catherine Hunke pulled down the shade and told them to go home. Harry Hunke was probably in the house, as a top coat (presumably his) was on a chair in the living-room.

Mrs. Fraser (plaintiff's mother) subsequently visited Catherine Hunke for the purpose of seeing if the young people could not be brought together. Mrs. Catherine Hunke said she could not do anything about it. When told by Mrs. Fraser she might try, and if nothing could be done, her daughter would have to go to law about it, Mrs. Catherine Hunke replied that they would fight her and her daughter.

The plaintiff thereafter received irregular and meagre support from her husband. She was obliged to give up the home and live with her parents, taking with her, of course, the child. She had her husband arrested in November, 1922, for non-support. He was arrested when about to attend the opening of a new threatre in which his father was financially interested. An order for the payment by him of $20 per week to the plaintiff was made. This was paid for a few weeks. After January, 1923, the plaintiff received no payments. Her husband disappeared. She became ill, unable to work, and was supported, as was her child, by her parents.

The foregoing is a brief recital of the outstanding incidents of the plaintiff's case. It does not purport to state all the

evidence.    The plaintiff's testimony was in many respects denied by the defendants' witnesses.

The grounds of appeal are thirteen in number.    They fall into three classes: *First,* those in which no exceptions to the court's rulings were taken; *second,* those which cannot be considered on appeal; and, *third,* those to which exceptions were duly taken.

The grounds of appeal in the first class mentioned will not be considered because this court will not consider on appeal alleged errors to which the trial court's attention has not been directed and which the record shows have not been the subject-matter of exceptions.    *O'Donnell* v. *Weiler,* 72 *N. J. L.* 142.    In this class are grounds of appeal 1, 2 and 3.

The second class will not be considered because they deal with the weight of the evidence and the alleged excessiveness of the verdict.    This court has no power to review in a civil case the weight of the evidence and the alleged excessiveness of the verdict.    *Smith* v. *Brunswick Laundry Co.,* 93 *N. J. L.* 436.    These questions are raised by grounds of appeal Nos. 4, 5, 6, 11, 12 and 13.

The third class will be considered.    They deal with the propriety of the court's refusal to nonsuit the plaintiff and to direct, at the close of the case, a verdict in favor of the defendants.

In considering whether or not these motions should have been granted it must be remembered, that in making the motions, the truth of the evidence and every inference of fact that can be legitimately drawn therefrom is admitted, but the sufficiency in law of the facts is denied.    This was well expressed in the recent opinion in this court in *Barry* v. *Borden Farm Products Co.,* 100 *N. J. L.* 106, where it was said:

"Motions for nonsuit and for the direction of a verdict for the defendant, for the purpose of the motions, in effect, admit the truth of the evidence and of every inference of fact that can be legitimately drawn therefrom, which is favorable to the plaintiff, but deny its sufficiency in law; and where such evidence or inferences of fact will support a ver-

dict for the plaintiff, such motions must be denied. *Weston Co. v. Benecke,* 82 *N. J. L.* 445."

The appellant argues that it was incumbent on the plaintiff to prove that the defendants were the procuring and proximate cause of the alienation of the affections of the plaintiff's husband, and that the defendants said, and did what was said, and done with the intention of causing the alienation, and that the evidence offered is insufficient to establish these facts. Conceding all that counsel for the defendants says in his argument concerning the character of proof which a plaintiff in this class of cases must offer, we have reached the conclusion, after a review of the testimony in the case, that the trial judge ruled properly in overruling the motions to nonsuit and for a direction of a verdict for the defendants. The testimony offered for the plaintiff has been outlined. It shows with reference to the defendant Catherine Hunke that the plaintiff and her husband were united until she made the suggestion about breaking up their home, followed up by action in taking her son to the Montclair house, and leaving his wife and child behind, and later permitting her son to live at his father's home. The unwillingness of Mrs. Catherine Hunke to make, upon solicitation by her son's wife and her mother, any effort towards a reconciliation, and the apparent willingness upon her part to permit the situation to drift into the courts, taken in consideration with the other matters mentioned, were facts from which, if the jury believed the plaintiff's testimony, they could infer that Mrs. Catherine Hunke intentionally and with malice alienated the affections of her son from the plaintiff.

The evidence against the defendant Edward Hunke was not as strong as that against Mrs. Catherine Hunke. We think it, however, sufficient to justify the court in submitting the case as against him to the jury. At the interview of October 12th, 1922, he was present. He heard the suggestion made by his wife, that the home of the young people be broken up. He made no protest against it. By his silence he acquiesced in it. He later harbored his son and assisted him in removing his wearing apparel from the apartment in-

which his son had lived with his wife. He made statements with reference to his son's arrest which criticised the plaintiff's action in this respect. He refused to make known his son's whereabouts after he had left the state. His actions were not those of an adviser of his son directed towards obtaining the performance of his son's legal and moral obligations towards his wife. His attitude was one of hostility towards the plaintiff and acquiescence in the campaign of gratuitous and officious intermeddling in the domestic affairs of the young people conducted by his wife. The jury, if they believed the plaintiff's testimony, would be justified in drawing the inference that his conduct was intended to cause a separation between his son and the plaintiff.

Situations like the one presented in this case are delicate matters. It does not require much exertion on the part of older persons to bring about a rupture between a married couple who are young and inexperienced. The parents of one of the contracting parties stand as to their child in a position of influence. Often, marriages of children are distasteful to parents. It is hard for them to have had their plans frustrated. It is difficult for them to reconcile themselves to what has taken place. Instead of adjusting themselves gracefully to the situation they scheme to undo the marriage knot. This course is often taken in the mistaken belief that it is for the best interest of the child. It is a course fraught with danger and frequently brings about the situation herein portrayed; a young girl with a child, separated from and unsupported by her husband, dependent upon her parents, ill, broken in health and spirit before reaching full womanhood; a young man, who ought to be performing his marriage vows, with his own home, supporting and cherishing his wife and child, a wanderer on the earth, tortured by his conscience, afraid to return and ask forgiveness. The jury believed this condition was instigated and accomplished by the defendants. The jury had an opportunity to see the witnesses, hear their testimony, pass upon their credibility, and determine the case.

We think the court ruled correctly in leaving the case to the jury for its decision. There was conflicting testimony

which it was the function of the jury to pass upon. The case is not before us in a form in which we can, as has been said, pass upon the weight of the evidence. We decide only questions of law upon an appeal. Seeing no error in the rulings of the trial court, which have been properly presented to us on this appeal, the judgment of the Supreme Court is affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, DEAR, JJ. 14.

*For reversal*—None.